UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT NORFOLK and JUDITH THOMPSON,

               Plaintiffs,

v.                                                                          Case Number: 08-10570
                                                                            Honorable David M. Lawson
COBO HALL CONFERENCE AND EXHIBITION
CENTER, TOM TUSKEY, CITY OF DETROIT,
ATTORNEY GENERAL MICHAEL COX and
JOHN DOES 1, 2, AND 3,

               Defendants.
_____/

## OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

The plaintiffs, Robert Norfolk and Judith Thompson, commenced this action on Thursday, February 7, 2008 seeking, among other things, an *ex parte* temporary restraining order and a preliminary injunction. The Court denied the former and set a hearing for the latter on February 11, 2008. At the hearing, attorneys for the plaintiffs and all defendants appeared, argued, and offered exhibits into the record. The exhibits were filed as part of the briefing submitted.

The action is based on the plaintiffs' claim that their First Amendment rights will be violated unless they are permitted to distribute leaflets at a February 12, 2008 conference to be held at Cobo Hall in Detroit, Michigan. The event is sponsored by the Michigan attorney general as a forum to provide the public with information concerning home mortgage foreclosures. Although the Court concludes that Cobo Hall is a nonpublic forum for the purpose of this event, it appears from the attorney general's briefing that its restriction against the plaintiffs' leafletting is not content-neutral, and limiting the plaintiffs from distributing leaflets violates the First Amendment. Therefore, the Court will grant the motion for a preliminary injunction.

I.

Defendant Michigan attorney general has advertised an event to occur at the Riverfront Ballroom of Detroit's Cobo Center by distributing flyers that state:

# AVOID FORECLOSURE

## TOOLS TO HELP SAVE YOUR HOME

A free forum from Attorney General Mike Cox

All forums will be open to the public from noon until 7:00 p.m.

Def. Br. in Resp. to Mot. for Prelim. Inj., Ex. 4.

According to the verified complaint, the plaintiffs are members of the Michigan Emergency Committee Against War and Injustice and have mounted a campaign for a moratorium on foreclosures. Defendant Cobo Hall Conference and Exhibition Center is a convention center owned and operated by defendant City of Detroit. Defendant Tom Tuskey is the Director of Cobo Hall. Attorney General Cox is sued in his official capacity.

The plaintiffs state that they seek to educate people who may be facing foreclosure about their campaign. It appears to be undisputed that on December 13, 2007, the plaintiffs attempted to distribute leaflets about their cause at an "Avoid Foreclosure" conference at Cobo Hall. Invitations consisting of flyers similar to the one quoted above were sent to tens of thousands of homeowners stating that "[t]he forum was open to the public and specifically those who are having problems with their mortgages in southeastern Michigan. 4,200 individuals attended the forum." Mot. ¶ 10-11. However, the plaintiffs were removed from Cobo Hall by three unknown police officers, identified as John Does I, II, and III, who stated they were acting on behalf of Mr. Tuskey and Attorney General Cox. The plaintiffs complain that the only way to reach attendees is by leafletting on the

premises because the parking is in the facility. "While each and every bank was welcomed to this forum and allowed to speak and set up shop inside the forum, Plaintiffs were excluded from being able to talk to individuals being affected by mortgage problems who would potentially be interested in the moratorium campaign because of the content of the campaign which challenges the same financial institutions which were being welcomed by Attorney General Michael Cox and Cobo Hall, Defendants in this case." Mot. ¶ 28.

As noted, another "Avoid Foreclosure" forum will take place tomorrow from noon to 7:00 p.m. at Cobo Hall. The plaintiffs desire to leaflet at this forum. The plaintiffs attempted to obtain permission from Attorney General Cox's office and Mr. Tuskey, but their phone calls were not returned.

The plaintiffs also have learned of two additional forums: one to be held at the Dow Event Center in Saginaw on February 13, 2008, and one to be held at the DeltaPlex Entertainment and Event Center in Grand Rapids on February 14, 2008. The plaintiffs also desire to leaflet at these forums, but their motion for a temporary restraining order and preliminary injunction apparently does not seek injunctive relief on this ground, and the Court does not address those gatherings in this order.

Defendant Cox has responded to the motion with assertions that the seminar is entitled "Avoid Foreclosure: Tools to Help Save Your Home," and is meant "to provide homeowners with a chance to have face-to-face contact with their individual loan services and loan counselors to find remedies to help avoid foreclosure." Def.'s Resp. at 5. "The Attorney General invited several servicers, HUD approved loan counselors and state and federal regulatory agencies to attend the seminar and assist homeowners." *Ibid.* Although the literature states that the event is open to the

public, the defendant asserts that individuals were invited to attend on the basis of their loan provider's determination that they may be at risk for foreclosure.

Apparently other groups attempted to leaflet or distribute information at the December 13, 2007 workshop, but "outside groups were not permitted to disrupt the seminar." The written response states that "Cobo Hall permits people to gather and protest in designated area surround the facility." Def.'s Resp. at 14 [sic]. However, at argument on the motion, the defendant clarified that the places designated for protesting are the public sidewalks and roadways leading to the facility. The plaintiffs point out that most Cobo Center attendees arrive by motor vehicle and park in garages under the building, arriving inside by elevator or stairway. Consequently, there is no access to the individuals short of stopping traffic on the public streets as the vehicles approach the parking garage.

The plaintiffs seek an order permitting them to hand out leaflets and obtain petition signatures at an area designated by the building operators inside the lobby of the building. The defendant contends that the plaintiffs' leafletting would "turn the non-political seminar into a vehicle to further their political agenda." It is inconsistent with the purpose of the seminar because

> Plaintiffs' moratorium only delays the issues. It is not a solution. Further, Plaintiffs' position could disrupt the cooperation of the mortgage servicers who are participating voluntarily. Plaintiffs' position is hostile to the servicers and focuses blame on them.

Def.'s Resp. at 12.

The attorney general contends that the plaintiffs have not shown that the injunction serves the public interest because "[b]orrowers . . . would be unnecessarily bombarded with literature designed to create cynicism and mistrust against servicers." Def.'s Resp. at 15. The attorney general continues:

-4-

Norfolk and Thompson want to impose their political beliefs on all the participants involved in the seminar. This does not serve the public interest in any way. The public interest would not be served if such an uncooperative adversarial environment were to flourish. Only by avoiding conflicting messages or conflicting signals during the foreclosure seminars could the public interest be served.

*Ibid.*

II.

A court considering whether to issue a preliminary injunction should "consider[] and balance[]" four factors:

(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief.

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (2007) (quoting *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir.2000), *overruled on other grounds*, *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 784 (2004)).  In a case implicating the First Amendment, "the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because, as in this case, the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the [rule or restriction]." *Ibid.*

To determine whether the government has violated an individuals free speech rights, the Sixth Circuit employs a three-step analysis:

(1) we ask whether the speech is protected under the First Amendment; (2) if so, using the public-forum doctrine, we ascertain whether the applicable forum is public or nonpublic; and (3) applying the appropriate standard for the forum, we ask whether the government's prohibition on speech passes muster under the First Amendment.

*S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553, 559 (6th Cir. 2007). The first part

of the test is easily met here. The Sixth Circuit has emphasized the centrality of the First

Amendment to the action of distributing leaflets:

> In its traditional form, leafletting occurs when individuals offer handbills, pamphlets, tracts, advertisements, notices and other information to individuals on the street or sidewalk who remain free to accept or reject the document. *Taxpayers for Vincent*, 466 U.S. at 809-10 ("The [leafletting] right recognized in Schneider [ v. New Jersey, 308 U.S. 147 (1939),] is to tender the written material to the passerby who may reject it or accept it, and who thereafter may keep it, dispose of it properly, or incur the risk of punishment if he lets it fall to the ground."). It is a venerable and inexpensive method of communication that has permitted citizens to spread political, religious and commercial messages throughout American history, starting with the half a million copies of Thomas Paine's Common Sense that fomented the American Revolution. *See Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (noting that "pamphlets and leaflets . . . have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest"); *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943) ("The hand distribution of religious tracts is an age-old form of missionary evangelism-as old as the history of printing presses."). . . .

> In each of these settings, the Supreme Court has made it clear that leafletting and related activities represent a method of speech protected by the First and Fourteenth Amendments. The Court has invalidated bans on leafletting on public streets. *See, e.g., United States v. Grace*, 461 U.S. 171, 183-84 (1983) (striking statute forbidding leafletting on the sidewalks surrounding the Supreme Court); *Jamison v. Texas*, 318 U.S. 413, 414 (1943) (striking ordinance forbidding leafletting on public streets); *Schneider*, 308 U.S. at 162-63 (striking ordinances forbidding leafletting on public streets). It has invalidated bans on door-to-door leafletting, where individuals offer the homeowner informational tracts at the same time that they try to engage the homeowner about the religious, political or commercial message they wish to convey. *See, e.g., Martin v. City of Struthers*, 319 U.S. 141, 149 (1943) (striking ordinance that forbade ringing a doorbell or otherwise summoning a resident to the door to receive handbills); *Schneider*, 308 U.S. at 165 (striking ordinance that forbade door-to-door leafletting). And it has invalidated licensing requirements for door-to-door solicitors and leafletters. *See Watchtower Bible & Tract Soc'y of New York*, 536 U.S. at 168 (striking ordinance prohibiting canvassers from going door-to-door among residences without a permit because it was "not tailored to the Village's stated interests"); *Lovell*, 303 U.S. at 451 (striking ordinance prohibiting "the distribution of literature of any kind at any time, at any place, and in any manner without a permit").

At the same time that the Court has invalidated bans on leafletting and unyielding licensing requirements for leafletting, it has indicated that the reserved police powers of the States (and cities) permit them to impose reasonable time, place and manner restrictions on leafletting. *See Frisby v. Schultz*, 487 U.S. 474, 488 (1988) (upholding ban on leafletting in front of a targeted residence); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654-55 (1981) (upholding regulation restricting leafletting at a state fair to assigned booths); *Hill*, 530 U.S. at 723 (upholding regulation prohibiting leafletters within 100 feet of a health care facility from knowingly coming within eight feet of another person without first receiving that person's consent); *cf. Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 380 (1997) (upholding injunction creating fixed buffer zones that prevented leafletters and protestors from approaching within 15 feet of health clinic doorways).

*Jobe v. City of Catlettsburg*, 409 F.3d 261, 263-65 (6th Cir. 2005).

The plaintiffs contend that they wish to hand out leaflets to members of the public attending the event at Cobo Center, which the attendees may accept or decline to take. The leaflets espouse the plaintiffs' view that a moratorium on foreclosures of residential mortgages should be declared, and that the current foreclosure crisis was brought about by predatory lending. They also wish to obtain signatures on a petition, presumably seeking official action along those lines. The Court finds that the plaintiffs' proposed leafletting activity advancing that viewpoint and seeking such political action is protected by the First Amendment.

Turning to the second step of the test, there are three types of public fora: "the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Id.* at 266 (citing *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)). The traditional public forum includes places like parks and streets that are "'government property that has traditionally been available for public expression.'" *Ibid.* (quoting *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992)). "The designated public forum consists of public

property 'that the State has opened for expressive activity by part or all of the public.'" *Ibid.* (quoting *Lee*, 505 U.S. at 678).

The plaintiffs contend that Cobo Hall is at least a designated public forum (which also is known in the cases as a "limited public forum"), while the defendant insist it is a nonpublic forum. "To determine whether the government intended to create a limited public forum, we look to the government's policy and practice with respect to the forum, as well as to the nature of the property at issue and its 'compatibility with expressive activity.'" *Kincaid v. Gibson*, 236 F.3d 342, 349 (6th Cir. 2001) (quoting *Cornelius*, 473 U.S. at 802). In determining that the parking lots and walkways of schools that were opened up for the limited purpose of voting were *not* a designated public forum, the Sixth Circuit held:

> [T]hese types of forums [limited or designated public forums] are characterized by discourse, and discourse is what is absent here. That some expressive activity occurred within the context of the forum created "does not imply that the forum thereby [became] a public forum for First Amendment purposes." *Cornelius*, 473 U.S. at 805. In the absence of evidence of an intent on the part of the government to open these nontraditional forums for public discourse, limited or otherwise, we conclude that the parking lots and walkways leading to the polling places are nonpublic forums, with no different status than the remaining areas on school and private property.

*United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 750 (6th Cir. 2004). "A designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *Arkansas Educ. Television Com'n v. Forbes*, 523 U.S. 666, 679 (1998). According to the Supreme Court

> cases illustrate the distinction between 'general access,' [*Cornelius*], at 803, which indicates the property is a designated public forum, and "selective access," *id.*, at 805, which indicates the property is a nonpublic forum. On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers, as the university made its facilities generally available to student groups in *Widmar*. On the other hand, the government does not

create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, "obtain permission," 473 U.S., at 804, to use it. For instance, the Federal Government did not create a designated public forum in *Cornelius* when it reserved eligibility for participation in the CFC drive to charitable agencies, and then made individual, non-ministerial judgments as to which of the eligible agencies would participate. *Ibid.*

*Id.* at 679-80.

Based on the information presented so far, it appears to the Court that Cobo Center is a nonpublic forum for the purpose of tomorrow's event. The Court understands the program to be a forum open to members of the public to meet with certain mortgage lenders who have been selected to participate; to attend seminars where speakers will provide information on various topics concerning lending options, refinancing, and obtaining other financial assistance; and to obtain information from various government agencies that might be able to provide assistance to borrowers who are in jeopardy of defaulting on their home mortgage obligations. Although members of the public are invited to attend and *receive* information, those allowed to *present* information must obtain permission to maintain a booth or a table. Under Supreme Court and Sixth Circuit precedent, the following have been found to be nonpublic fora: a city's website with various hyperlinks, *Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834, 841 (6th Cir. 2000), an office in a government building, *Helms v. Zubaty*, 495 F.3d 252 (6th Cir. 2007), a courtroom, *Mezibov v. Allen*, 411 F.3d 712 (6th Cir. 2005), common areas of a sports complex, *United Church of Christ v. Gateway Economic Development Corp. of Greater Cleveland*, 383 F.3d 449 (6th Cir. 2004), a school district's internal mail system that had been opened up to certain mail, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), an airport, *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992), or an internal government employee fundraising program. *Cornelius*

*v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788 (1985). The Court believes that the event at Cobo Center more closely approximates those fora than, say, the public square, a library, or a fairground. *See, e.g., Neinast v. Board of Trustees of Columbus Metropolitan Library*, 346 F.3d 585 (6th Cir. 2003) (library); *Heffron v. International Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) (state-owned fairgrounds). Because the event is limited to "a particular class of speakers, whose members must then, as individuals, obtain permission," *Arkansas Educ. Television Com'n*, 523 U.S. at 680, the likelihood is that the forum will be found to be nonpublic.

The third part of the analysis requires an assessment of whether the government's action is reasonable in light of the nature of the forum. Although "[c]ontent-based restrictions on speech in public and designated public fora are subject to strict scrutiny," *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007) – a test that does not apply here – "[t]he government may lawfully restrict speech in a nonpublic forum so long as the restrictions are viewpoint neutral and reasonable in light of the purpose served by the forum." *Id.* at 257. "The Supreme Court has made clear that any regulation that requires reference to the content of speech to determine its applicability is inherently content-based." *Pagan v. Fruchey*, 492 F.3d 766, 779 (6th Cir. 2007) (en banc) (citing *City of Cincinnati v. Discovery Network*, 507 U.S. 410, 429 (1993)).

For rules that restrict speech in nonpublic fora, the Court "appl[ies] the traditional time-place-and-manner test to the regulation." *Jobe*, 409 F.3d at 267 (citing *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808, 815 (1984)). "To qualify as a reasonable time-place-and-manner regulation of speech, the law must (1) be content-neutral, (2) serve a significant government interest, (3) be narrowly tailored to serve that government interest and (4) leave open ample alternative channels of communication." *Ibid.*

In *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992), a plurality of the Supreme Court concluded that an airport terminals was a nonpublic forum. *Id.* at 680. The Court found that the airport terminal's restriction on face-to-face solicitation to a sidewalk outside of the terminal was reasonable, and therefore could be upheld. The Court found it significant that

> This sidewalk area is frequented by an overwhelming percentage of airport users, *see* [Sloane Affidavit], at ¶ 14, App. 515-516 (noting that no more than 3% of air travelers passing through the terminals are doing so on intraterminal flights, i.e., transferring planes). Thus the resulting access of those who would solicit the general public is quite complete. In turn we think it would be odd to conclude that the Port Authority's terminal regulation is unreasonable despite the Port Authority having otherwise assured access to an area universally traveled.

*Id.* at 684-85. Yet in a companion case, the Supreme Court found that a total ban by airports on distribution of literature was invalid. No one opinion garnered a majority, however. Finding the flat ban on distribution invalid, Justice O'Connor wrote for herself. Justice Kennedy and Justice Souter authored separate opinions, joined by Justices Blackmun and Stevens, concluding that the airports were public forums. Chief Justice Rehnquist, joined by Justices White, Scalia, and Thomas dissented. Justice O'Connor provided the deciding vote, finding the airport to not be a public forum, and voting to affirm the ban on face-to-face solicitation while striking down the ban on leafletting. Because Justice O'Connor's decision was on the narrowest ground, it provides the controlling rule of law. *Marks v. United States*, 430 U.S. 188, 193 (1977).

Justice O'Connor's opinion read, in relevant part:

> In my view, however, the regulation banning leafletting – or, in the Port Authority's words, the "continuous or repetitive . . . distribution of . . . printed or written material" – cannot be upheld as reasonable on this record. I therefore concur in the judgment in No. 91-339, 505 U.S. 830, striking down that prohibition. While the difficulties posed by solicitation in a nonpublic forum are sufficiently obvious that its regulation may "rin[g] of common-sense," *Kokinda*, 497 U.S., at 734 (internal quotation marks and citation omitted), the same is not necessarily true of leafletting. To the contrary, we have expressly noted that leafletting does not entail the same

-11-

kinds of problems presented by face-to-face solicitation.  Specifically, "[o]ne need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand. . . . 'The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time.' " *Ibid.* (plurality opinion), quoting *Heffron*, *supra*, 452 U.S., at 665 (Blackmun, J., concurring in part and dissenting in part).  With the possible exception of avoiding litter, *see Schneider v. State ( Town of Irvington)*, 308 U.S. 147, 162 (1939), it is difficult to point to any problems intrinsic to the act of leafletting that would make it naturally incompatible with a large, multipurpose forum such as those at issue here.

We have only once before considered restrictions on speech in a nonpublic forum that sustained the kind of extensive, nonforum-related activity found in the Port Authority airports, and I believe that case is instructive. In *Greer v. Spock*, 424 U.S. 828 (1976), the Court held that even though certain parts of a military base were open to the public, they still did not constitute a public forum in light of " 'the historically unquestioned power of [a] commanding officer summarily to exclude civilians from the area of his command.' " *Id.*, at 838, quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 893 (1961).  The Court then proceeded to uphold a regulation banning the distribution of literature without the prior approval of the base commander.  In so doing, the Court "emphasized" that the regulation on leafletting did "not authorize the Fort Dix authorities to prohibit the distribution of conventional political campaign literature."  Rather, the Court explained, "[t]he only publications that a military commander may disapprove are those that he finds constitute 'a clear danger to [military] loyalty, discipline, or morale' " and that "[t]here is nothing in the Constitution that disables a military commander from acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command." 424 U.S., at 840 (citation omitted).  In contrast, the regulation at issue in this case effects an absolute prohibition and is not supported by any independent justification outside of the problems caused by the accompanying solicitation.

Moreover, the Port Authority has not offered any justifications or record evidence to support its ban on the distribution of pamphlets alone.  Its argument is focused instead on the problems created when literature is distributed in conjunction with a solicitation plea.  Although we do not "requir[e] that . . . proof be present to justify the denial of access to a nonpublic forum on grounds that the proposed use may disrupt the property's intended function," *Perry*, 460 U.S., at 52, n. 12, we have required some explanation as to why certain speech is inconsistent with the intended use of the forum. . . . Because I cannot see how peaceful pamphleteering is incompatible with the multipurpose environment of the Port Authority airports, I cannot accept that a total ban on that activity is reasonable without an explanation as to why such a restriction "preserv[es] the property" for the several uses to which

-12-

it has been put. *Perry*, supra, 460 U.S. at 50-51 (internal quotation marks and citation omitted).

*International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 690-93 (1992) (O'Connor, J.).

The attorney general contends that the ban on leafletting is content neutral and serves an important governmental interest. His supporting reasons, however, undercut these conclusions. The asserted government interest is that leafletting should be banned because the ideas contained within the leaflets are "not a solution" to the foreclosure problem. He also asserts that the plaintiffs' viewpoint conflicts with that of the lenders who have been invited to participate in the event. It seems to the Court that this position badly misunderstands what is an appropriate governmental interest in the First Amendment context, and actually makes the restriction more questionable because it is based on the content of the leaflets. The attorney general argues that the leafletting should not be allowed in Cobo Center because the plaintiffs will espouse an idea that "is hostile to the [loan] servicers and focuses blame on them." Whether lenders should share the blame for Michigan's foreclosure crisis is, perhaps, a debatable point. However, shielding lenders and the public who will come to see them from this viewpoint certainly cannot be a governmental interest (and more certainly, not a significant one) that justifies curtailing speech.

At the motion argument, the defendant suggested that the ban on leafletting would keep congestion to a minimum, avoid harassment, and allow easy access to the buildings. Yet the distribution of handbills in a large conference center does not implicate these concerns. The lobby of Cobo Center is vast, extending for several blocks indoors from the corner of Congress and Washington Boulevard to the entrance of the Riverfront Ballroom. It is difficult to apprehend how

two people passing out leaflets and asking for signatures on petitions would be disruptive or cause congestion.

The defendants propose a total ban on leafletting inside Cobo Center. They do not seek to restrict the location of leafletting, limit the time during which information can be distributed, restrict the size of the brochures or the number of leafletters, or otherwise impose limits on the activity that might address their asserted concerns, such as asking that members of the public avoid mentioning a mortgage moratorium. The Court does not believe that a total ban under the circumstances of this case can amount to a restriction that is "narrowly tailored to serve [a] government interest. *Pagan*, 492 F.3d at 779.

Finally, according to the plaintiffs, there are no alternative channels of communication because the underground parking and the conference areas are connected, so there are no other ways for the plaintiffs to distribute leaflets to the conference attendees approaching the facilities. The Court agrees. Members of the public traveling to Cobo Center generally park in underground lots and enter by elevator into the main structure. Since there is a small percentage of foot traffic that enters the building from the sidewalk, that leaves the plaintiffs with the option of stopping motor vehicle traffic on busy city streets to convey their message. The Supreme Court's decision in *Lee* is instructive on this point. Finding that solicitation could be regulated by the airports, the Court noted that there was a place designated for those activities that was highly effective in reaching a large audience. That fact is missing here. Justice O'Connor found that leafletting should be allowed in the airport, noting that the nature of leafletting was consistent with the overall flow of the airport. That same logic applies here.

-14-

The Court concludes that although Cobo Center is a nonpublic forum for the purpose of tomorrow's event, the defendants' total ban on leafletting does not pass the test for a regulation of speech in a way that the First Amendment allows. Therefore, the plaintiffs have demonstrated a likelihood of success on the merits of their claim. The Court also believes that if the plaintiffs lose out on the ability to offer their message to the thousands of attendees, they would suffer irreparable harm. There is little reason to suspect grave harm will incur to the defendants or others if the plaintiffs distribute their leaflets. Finally, given the Court's conclusion that the plaintiffs' First Amendment rights would be abridged, the public interest factor weighs in favor of the injunction.

III.

For these reasons, the Court finds that the plaintiffs have demonstrated that they are entitled to a preliminary injunction.

Accordingly, it is **ORDERED** that the plaintiffs' motion for a preliminary injunction [dkt # 2] is **GRANTED**.

It is further **ORDERED** that the defendants, their officers, servants, agents, employees, attorneys, and those in active concert and participation with them who receive actual notice of this order, are restrained and enjoined from prohibiting the plaintiffs, ROBERT NORFOLK and JUDITH THOMPSON, or either of them, from distributing leaflets or asking members of the public to sign a petition in the lobby of Cobo Center during business hours on Tuesday, February 12, 2008; provided that the defendants may restrict the plaintiffs' activity to an area of reasonable size in the lobby of Cobo Center as long as the area permits access to public traffic, including members of the public who are attending the event at the Riverfront Ballroom.

It is further **ORDERED** that no security shall be required because it is unlikely that the defendants will incur costs, damages, or other monetary harm from the issuance of this temporary injunction.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: February 11, 2008

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 11, 2008.

s/Felicia M. Moses
FELICIA M. MOSES

---

-16-